

AO 91 (Rev. 11/11) Criminal Complaint

FILED
4/19/2023
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

AUSA Jimmy Arce (312) 613-2700
AUSA Patrick Mott, (312) 554-9133

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

v.

LEROY PATTERSON

CASE NUMBER: 23 CR 230

**UNDER SEAL**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about August 18, 2021, at Lansing, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | did knowingly and intentionally distribute a controlled substance, namely, 500 grams or more of a mixture and substance containing a detectible amount of cocaine, a Schedule II Controlled Substance. |

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

SHAMAR BAILEY
Special Agent, Federal Bureau of Investigation (FBI)

Sworn to before me and signed in my presence.

Date: April 19, 2023

*Judge's signature*

City and state: Chicago, Illinois

YOUNG B. KIM, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## **AFFIDAVIT**

I, SHAMAR BAILEY, being duly sworn, state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since approximately March 2016. I am currently assigned to the FBI's Chicago Field Division, Violent Gangs - South. As part of my duties as a FBI Special Agent, I investigate criminal violations of Federal and State controlled substance laws including, but not limited to, conspiracy to possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 846; and possession with intent to distribute and distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1).

2. I have received specialized training in the means and methods by which individuals and drug trafficking organizations conduct their illegal drug trafficking activities. I have also participated in multiple investigations involving illegal drug trafficking by drug trafficking organizations. As such, I am familiar with the various methods used by drug traffickers to transport, store, and distribute narcotics and narcotics proceeds. I have participated in investigations involving various drug types, including heroin, cocaine, and cocaine base in the form of crack cocaine. I have experience with a wide range of investigative techniques, including various types of visual and electronic surveillance, the interception of wire communications; the debriefing of defendants, witnesses and informants, as well as others who have

knowledge of the distribution and transportation of controlled substances; facilitating controlled deliveries of narcotics; the execution of search and arrest warrants; and the management and use of informants. Based upon my experience and training, I am familiar with the ways in which drug traffickers conduct their unlawful drug trafficking activity, including, but not limited to, their use of code words and numbers to conduct their transactions, their methods for concealing narcotics and narcotics proceeds, and their use of violence and threats of violence to protect their organization.

3.      This affidavit is submitted in support or a criminal complaint alleging that Leroy PATTERSON has violated Title 21, United States Code, Section 841(a)(1) (distribution of a controlled substance). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging PATTERSON with distribution of a controlled substance, I have not included each fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

4.      The information in this affidavit is based on my participation in this investigation, information provided by other local and federal law enforcement officers; the results of physical surveillance, review of conversations intercepted pursuant to court orders authorizing the interception of wire and/or electronic communications, law enforcement reports, laboratory reports, criminal history records, information obtained from witnesses and/or other persons with knowledge of

relevant facts, my training and experience, and the training and experience of other law enforcement officers with whom I have consulted.

## FACTS SUPPORTING PROBABLE CAUSE

### I.     BACKGROUND OF THE INVESTIGATION

5.     Since early 2017, the FBI has been investigating allegations that members of the Racketeers street gang, also known as "Rack City," a faction of the Black P Stone Nation gang, are engaged in firearms and narcotics offenses (collectively "Rack City DTO" or "Rack City").

6.     Based on information obtained from court authorized Title III interceptions of Leroy PATTERSON, PATTERSON has been identified as a member of the Black P Stones gang who is involved in the distribution of narcotics within the street gang.[1]

---

[1] During the course of this investigation, the government obtained court authorization to intercept the wire and electronic communications occurring over telephone number 773-619-9318 ("Target Phone 3") for the following time periods: July 29, 2021 to August 27, 2021 (July 29, 2021 Order entered by Chief Judge Pallmeyer); October 7, 2021 to November 5, 2021 (October 7, 2021 Order entered by Chief Judge Pallmeyer); and November 19, 2021 to December 18, 2021 (November 19, 2021 Order entered by Chief Judge Pallmeyer).

This affidavit contains excerpts and summaries from intercepted and recorded communications over Target Phone 3. The language that is quoted from the recorded conversations throughout this affidavit is based upon a preliminary review of the intercepted conversations and not on final transcripts of the intercepted conversations. Summaries and excerpts do not include all statements or topics covered during the course of the recorded conversations. At various points in the affidavit I have included in brackets my interpretation of words and phrases used in recorded conversations. My interpretations are based on the contents and context of the recorded conversations, events occurring before and after the conversations, my knowledge of the investigation as a whole, my experience and training, and the experience and training of other law enforcement agents in this investigation.

**II. ON OR ABOUT AUGUST 18, 2021, PATTERSON DISTRIBUTED 2 KILOGRAMS OF COCAINE TO UM-61917**

7. In summary and as described below, during the morning of August 18, 2021, PATTERSON used Target Phone 3 to coordinate the sale of two kilograms of cocaine to an unknown male referred to herein as UM-61917. Later that same day, law enforcement observed PATTERSON meet an individual believed to be UM-61917 in a parking lot and hand UM-61917 an object. UM-61917 departed the area in the passenger seat of a Chevrolet Impala. Soon after, the Impala stopped in another parking lot, where law enforcement observed UM-61917 place an object into the trunk of the Impala and then depart the area in a different vehicle. After the Impala departed the parking lot, law enforcement pulled over the Impala, which was driven by Individual F, and recovered two kilograms of cocaine from the trunk of the Impala. Later that same day, law enforcement intercepted calls between PATTERSON and UM-61917 in which they shared information about how law enforcement seized the narcotics from Individual F.

8. On or about August 18, 2021, starting at approximately 10:13 a.m., PATTERSON, using Target Phone 3, exchanged text messages with UM-61917, who

---

Law enforcement identified Leroy PATTERSON as the user of Target Phone 3 based on the following: a) According to Sprint, Target Phone 3 is subscribed to Individual G, PATTERSON's wife, at 3307 South Bramanti Trail in Steger, Illinois, a residential address that, according to law enforcement databases, previously was shared by PATTERSON and Individual G; and b) The user of Target Phone 3, set up two meetings on or about June 25, 2021, July 9, 2021 and August 18, 2021. During surveillance of those meetings, law enforcement observed an individual who law enforcement identified as PATTERSON, based on a comparison with a known photo of PATTERSON, appear for the meetings.

was using telephone number 608-XXX-1917 (TP3, Sessions 5559, 5561, 5562, 5564, 5565, 5566, 5568, 5569, 5571, 5573, 5574, 5576, 5578, 5579, 5580, 5581, 5583, 5585, 5587, 5588, 5590, 5597, 5599, 5610, 5611, 5613):

UM-61917: Yo[.]

UM-61917: Trying to get that way [come to Chicago.]

PATTERSON: Ok[.]

PATTERSON: I'm in Lansing [Illinois.]

UM-61917: Imma let you know in the next hour[.]

PATTERSON: I got to get it [narcotics supply] tho its put up [at the stash location] so let me know[.]

UM-61917: Ok[.]

PATTERSON: Nope south on torrence by wendys[.]

UM-61917: Ok[.]

UM-61917: U got any room to push [front] one [kilogram of ordered narcotics?]

PATTERSON: I got 3 [kilos] left if you can wait [until I get resupplied] I will[.]

PATTERSON: Couple days [until I get resupplied.]

PATTERSON: I had these [kilograms] before I left and then [when] these done I got better number [price for the resupply.]

UM-61917: Ok I'm ready for the two [kilograms.]

UM-61917: Imma just waiting to see bout my ride[.]

UM-61917: Let u know in hr[.]

PATTERSON: When I'm fresh [at the start of new narcotics supply] you can get as many [kilograms] as you want cause [cause] time frames start over[.]

UM-61917: Ok Kool[.]

PATTERSON: That's why I was trying to get you to come grab them when I was gone[.]

UM-61917: My granny had passed I got sidetracked[.]

UM-61917: Ok be there in a hour[.]

UM-61917: They def could've been gone[.]

UM-61917: Lol[.]

PATTERSON: Dam sorry to hear that I sho left a [. . .]

5

PATTERSON: I knowing [. . .]

PATTERSON: I'm [. . .]

PATTERSON: Be needing the help [with distribution] when I'm fresh [directly after resupply.]

UM-61917: Next hr I'm trying to be in route[.]

UM-61917: Fasho mf [customers] been at me to [narcotics supply in high demand.]

9. Later that day, at approximately 11:03 a.m., PATTERSON, using the Target Phone 3, received an incoming call from UM-61917, who was using 608-XXX-1917 (TP3, Session 5615):

PATTERSON: Hello.

UM-61917: Yeah.

PATTERSON: What up man.

UM-61917: Yeah [unintelligible] link in 30 minutes [unintelligible] what it come to.

PATTERSON: You say what happened?

UM-61917: I just need somewhere to come to again because I [unintelligible].

PATTERSON: I had them what-u-call-it left I just got to get at get 'em he really waiting on me.

UM-61917: Uh huh.

PATTERSON: So you just gotta tell me uh let me know [how many] cause I know use that part up.

UM-61917: Yep yep so that's what I got up. It's gone be 2 of them [kilograms] just 2 [kilograms].

PATTERSON: Ok so look that's even better because by the time I what-u call-it you'll be finish [complete sales in previous narcotics supply] Imma but Imma text you when I'm see him [supplier] and just . . .

UM-61917: Uh huh.

PATTERSON: Just come and even if you gotta put yours on the other end just come grab these mu-fuckers.

UM-61917: OK OK yeah cause I show been having mu-fuckers [unintelligible].

PATTERSON: I already know and Imma tell you now my my number really can be out yo [unintelligible] he wanted get me to get out there. I just don't

6

move like that because I don't know how like y'all you know what I'm saying I got certain mu-fuckers but I don't be knowing and I don't be wanting to grab and y'all responsible.

UM-61917: Right right right.

PATTERSON: That's the only thing that's why I be telling you right like I had left them mu-fuckers if you'd told me that like you could all them mu-fuckers cause I had left them for you when you said that's why I was like I left them [kilograms] wit my brother-in-law you know what I'm saying yeah he older that's why I told you like you gone go to his crib. Everything is a hundred when I tell you like did that and it's [PATTERSON's brother-in-law's residence] really like 7 blocks from me [PATTERSON's residence].

UM-61917: Right right.

PATTERSON: Yeah I was having you come all the way over and you just gone face [FaceTime] me when you there that was all.

UM-61917: Right OK.

PATTERSON: Ah yeah anytime it's like that I definitely like its family like real family like I know cuz [unintelligible] or nothing like that, I'll never do nothing like that but you say you said probably like 30 minutes.

UM-61917: It be like 30 minutes, I'm waiting for my [unintelligible] finna take me then we on.

PATTERSON: OK well let me turn back around. Imma be in the [unintelligible] I'm just on Torrence 172nd and Torrence in Lansing [Insurance Company Office] but I I shoot it to you.

UM-61917: Aight yeah.

PATTERSON: But you know what remember when was in the Challenger that time.

UM-61917: When I get to the area I know [unintelligible].

PATTERSON: Ah no no it's no problem bro it's no problem I'm just finna um let me swing back cause Imma be there for a few hours any way.

UM-61917: OK.

PATTERSON: And I'll grab them [kilograms] for you.

UM-61917: Aight.

PATTERSON: Aight.

10.     Starting at approximately 11:46 a.m., PATTERSON, using Target Phone 3, exchanged a series of text communications with UM-61917 (TP3, Sessions 5648, 5650, 5691, 5693, 5766, and 5769), including:

UM-61917: Can u send [your] location
PATTERSON: Ok
UM-61917: 20 min
PATTERSON: Ok

11.     Although investigators did not intercept any subsequent electronic communications from Target Phone 3 communicating PATTERSON's location, as discussed below, UM-61917 subsequently met PATTERSON in the parking lot of a State Farm Insurance office in Lansing, Illinois.

12.     At approximately 2:15 p.m., law enforcement surveillance observed a beige colored Chevrolet Impala enter the parking lot located at 2366 172nd St. in Lansing, Illinois and park next to a Dodge Caravan used by PATTERSON.[2] An unidentified black male wearing a white shirt, believed to be UM-61917 based on subsequent communications between Target Phone 3 and UM-61917 referencing this parking lot meeting, exited the front passenger side of the Impala and approached PATTERSON, who was standing on the passenger side of the Caravan in the space between the Caravan and the Impala. PATTERSON then opened the passenger

---

[2] Law enforcement identified PATTERSON in the parking lot by comparing the individual with a known photograph of LEROY PATTERSON and determining it was the same individual.

Law enforcement has identified the State Farm office located at 2366 172nd St. in Lansing, Illinois to be an office used by PATTERSON's wife, based on open-source information and surveillance.

sliding door of the Caravan and handed the unidentified male an object, which appeared to be enclosed in a light-colored material. Following the exchange, PATTERSON and the unidentified male engaged in a brief conversation, captured in the surveillance photograph below, in which PATTERSON can be seen wearing a black shirt behind the Impala, standing to the right of the unidentified male wearing a white shirt:



13.     At approximately 2:18 p.m., the unidentified male reentered the front passenger side of the Impala and departed the parking lot.

14.     Law enforcement maintained surveillance on the Impala as it exited the parking lot. Law enforcement observed that the unidentified male was seated in the

front passenger seat. Law enforcement followed the Impala as it traveled to the parking lot of a fast-food restaurant located at 17010 Torrence Avenue in Lansing, Illinois. While in the restaurant parking lot, the unidentified male exited the front passenger side of the Impala and placed what appeared to be one or more darker objects into the trunk of the Impala. The unidentified male entered a gray 2008 Chevrolet Suburban, which was already parked in the restaurant parking lot at the time the Impala arrived.

15.     Law enforcement continued to maintain surveillance on the Impala as it traveled on I-294, toward Rockford, Illinois.

16.     While conducting surveillance as part of this investigation, Illinois State Police Trooper Kevin Krol observed that the Impala was driving over the speed limit and had a cracked front windshield. At approximately 3:29 p.m., Trooper Krol activated the emergency lights on his unmarked law enforcement vehicle and conducted a traffic stop of the Impala on I-294.

17.     During the traffic stop, Trooper Krol identified the driver and sole occupant of the Impala as Individual F. According to Trooper Krol, Trooper Krol's K9 partner "Hades" alerted at the rear of the Impala.[3] Law enforcement searched the

---

[3] According to Trooper Krol, Hades is certified annually by the Illinois State Police as a narcotics and apprehension dog. Hades has been certified by the Illinois State Police since the fall of 2020 and was recertified in July 2021. Hades is trained to sniff buildings, vehicles, envelopes, and wrapped parcels to detect the odors of heroin, cocaine, methamphetamine, ecstasy, and other controlled substances that could be contained inside those areas. Hades is also trained to indicate the presence of such substances or their scents by alerting to the item he is sniffing. To the best of my knowledge, the Illinois State Police does not maintain records regarding the overall success rate for its drug detection dogs.

trunk of the Impala and seized two large dark brick objects enclosed in clear sealed bags and stored inside of a cardboard box. Below is a photograph of the box containing the two packages inside of the trunk of the Impala.





18.     Approximately 56 minutes after the seizure of the cocaine from the Impala, at approximately 5:25 p.m., PATTERSON, who was using Target Phone 3, received a call from UM-61917, who was using 608-XXX-1917 (TP3, Session 5766):

11

PATTERSON: Hello.

UM-61917: Yo.

PATTERSON: Yeah.

UM-61917: Yeah you got- fuck man. Damn [unintelligible] shit crazy [unintelligible] fuck.

PATTERSON: What happened?

UM-61917: Uhhhh shit, you ain't on, [unintelligible] on a secure line?

PATTERSON: Yeah I don't, I don't, why?

UM-61917: Right, shit, that shit, that fucking same car that was in that mu-fuckin parking lot bust down on a mother fucker [a suspected law enforcement vehicle stopped the Impala].

PATTERSON: What car?

UM-61917: [Unintelligible].

PATTERSON: Who?

UM-61917: Man I don't even want to be on this mother fucking [unintelligible] I ain't even gonna lie. [Unintelligible] damn, damn, damn. Uh I'm finna go . . . shit. [Unintelligible] shit ain't come in right though. You feel me?

PATTERSON: Yeah.

UM-61917: Yeah, so. [Unintelligible] fuck. Damn I wish I could uhh . . .

PATTERSON: [Unintelligible].

UM-61917: The other one?

PATTERSON: The other one? What that?

UM-61917: FaceTime right?

PATTERSON: Yeah, this one.

UM-61917: This one? Alright, hold on.

19. Based on my knowledge of the investigation, my training and experience, the training and experience of other law enforcement officers, and the content and context of the conversation, I believe UM-61917 informed PATTERSON that the Impala had been "busted," meaning that it had been stopped by law enforcement after PATTERSON and UM-61917's meeting.

12

20.     At approximately 5:28 p.m., PATTERSON, using Target Phone 3, received an incoming call from UM-61917, who was using 608-XXX-1917 (TP3, Session 5769):

PATTERSON: Yeah.

PATTERSON: Hello?

UM-61917: [Unintelligible].

PATTERSON: You said what now?

UM-61917: Damn, I said I was tryin' to call you on [unintelligible] on the FaceTime.

PATTERSON: You said the same car in the parking lot?

UM-61917: Yeah.

PATTERSON: What car, that white truck?

UM-61917: No it was the black one, black joint. All tinted out.

PATTERSON: And who diming you out.

UM-61917: They didn't snatch me. Cuz you know I was, whatever. But yeah, I, that's why I always [unintelligible] these motherfuckers.

PATTERSON: Where at though?

UM-61917: Off the e-way [expressway] I guess. Cuz I switched [to a different vehicle at the restaurant parking lot].

PATTERSON: Huh?

UM-61917: I said I had switched the truck, you know how I do, but shit. Damn man, I want to- I need to talk to you direct man, I don't even want to be on this mother fuckin thing [phone line].

PATTERSON: I can go get the other one [other telephone number], you hit the face [FaceTime]?

UM-61917: Yeah, that's the one, that's the one I want, that's the one I want [unintelligible].

PATTERSON: Alright, hang up, hang up, hang up.

UM-61917: Alright.

13

21. A few minutes later, at approximately 5:50 p.m., PATTERSON, who was using Target Phone 3, placed an outgoing call to UM-61917, who was using telephone number 608-XXX-1917 (TP3, Session 5789):

UM-61917: Yo.

PATTERSON: Yeah, man I can't get to that muthafucka. You made it to the crib though?

UM-61917: Yeah, I made it but somebody else didn't make it [laughs].

PATTERSON: How far they get?

UM-61917: Ah shit, uhh, shit it's is is kinda your way [still in Illinois], still I'm thinkin' . . . but the fuck it's crazy. It's all crazy [laughs].

PATTERSON: What you mean?

UM-61917: Mean shit they got every muthafucka, I mean they got a muthafucka [unintelligible].

PATTERSON: What they say?

UM-61917: Ah shit [unintelligible] shit I don't, man I don't even know. I'm wonderin what the fuck gonna go on.

PATTERSON: So they just called you?

UM-61917: Yep.

PATTERSON: She did [Individual F]?

UM-61917: Yep.

PATTERSON: And said what?

UM-61917: Shit, muthafucka got, she's jammed up.

PATTERSON: And they [law enforcement] let her call you?

UM-61917: I, yeah. It's all bad . . . Shit . . . .

PATTERSON: Fuck.

22. Based on my knowledge of the investigation, my training and experience, the training and experience of other law enforcement officers, and the content and context of the conversation, I believe that UM-61917 told PATTERSON that law enforcement seized the narcotics that were transported by Individual F on his behalf.

14

23. On or about August 27, 2021, at approximately 4:37 p.m., PATTERSON, using Target Phone 3, received a call from UM-61917, who was using 608-XXX-1917 (TP3, Session 8108):

PATTERSON: Everybody, everybody, cool my way, then, you know I'm saying? That's why I was like nah, she [Individual F] probably didn't just jagged herself on that e-way [expressway].

UM-61917: Hell yea, that or, god dammit, she pulled it [stole the narcotics] god dammit.

PATTERSON: Yep, or she Individual F pulled it man, it [the traffic stop and subsequent release of Individual F] was too fast, first of all.

UM-61917: Hell yea. That's what I said, too damn fast!

PATTERSON: That's too fast. It don't even work like that, even when they, do, believe me, and they let you go, they gonna have you take some hours [even if law enforcement releases you after a stop, it will only be after a few hours].

*\*\**

PATTERSON: That's impossible. And they woulda whatcha call you first. They [law enforcement] ain't finna ride it that long.

UM-61917: Hell nah that's what I'm sayin' goddamit that, they [law enforcement] woulda seen everything [the entire narcotics transaction], so they would got at [would have confronted] me too.

*\*\**

UM-61917: It's just so fucked up right now, because you know my little situation, that shit comin' in to the [unintelligible].

PATTERSON: Nah, it's cool, that's what my man say, he say, really tell him man, I know what he talkin bout, we gonna help him get that. Don't worry bout that.

UM-61917: Yeah.

PATTERSON: Yeah that's what he say. He ain't worried about that. He just. He said well tell him to sit back and chill, and when yo ready just call. But Imma still call you every day, and our relationship ain't that [unintelligible].

UM-61917: Hell yeah fa sho, fa sho. I figured…

*\*\**

PATTERSON: But like I said I had talked to him yesterday, and he had said tell him no worries. So that's, we ok. Don't worry about that part, just worry

15

about your end. Then once everything comfortable, don't worry about nothin. We'll figure out something for you.

24. The packages seized from the Impala driven by Individual F were submitted to the DEA's North Central Laboratory for testing. According to DEA North Central Laboratory, the substance in one package weighed 1,005.3 grams and tested positive for the presence of cocaine; the substance in the second package weighed 1,007 grams and tested positive for the presence of cocaine. In total, the cocaine seized from the Impala weighed 2,012.3 grams, or just over 2 kilograms.

## CONCLUSION

25. Based on the foregoing facts, I believe there is probable cause to believe that, on or about August 18, 2021, LEROY PATTERSON did knowingly and intentionally distribute a controlled substance, namely, 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

FURTHER AFFIANT SAYETH NOT.

SHAMAR BAILEY
Special Agent
Federal Bureau of Investigation

SUBSCRIBED AND SWORN to before me on April 19, 2023.

Honorable YOUNG B. KIM
United States Magistrate Judge

16